Anthony P. Savarese, S.
In this discovery proceeding the administratrix c. t. a., seeks to recover the proceeds of three joint accounts in savings banks which were originally the property of decedent, Vincent Kurpes, who died on January 28,1958, a resident of Queens County. On July 7,1945, decedent made a will which provided that the money in two of the above-mentioned accounts, then in his individual name, should be divided among three nieces and a nephew. During the month of April in 1957, about 10 months before he died, decedent transferred said accounts from his sole name into joint accounts with Leocadia Bill, his niece, the respondent herein. No funds were *650 withdrawn from any of these accounts until after decedent’s death. On November -30, 1957, decedent fell down the stairs in his home and was taken by ambulance to the Queens General Hospital where he remained about six days. On December 5, 1957, he was transferred to Kings County Hospital and while still confined there he was certified as mentally ill. An order of commitment for observation was issued on January 2, 1958, and he was committed to Creedmoor State Mental Hospital on January 7,1958, where he remained until his death three weeks later. Since there was no credible evidence of fraud and undue influence, the sole issue to be determined is whether the decedent was competent at the time the transfers were made.
The petitioner’s case rests on the testimony of tw-o doctors and certain documentary evidence. Dr. Philipp testified that the decedent was his patient for about 10 years, that he had examined the decedent on March 9, 1957, that his diagnosis at that time was one of generalized arterial sclerosis and senile dementia and that decedent ‘ ‘ already showed gross intellectual enfeeblement. ’ ’ Dr. Diamond of Creedmoor State Mental Hospital testified that he examined decedent a week before his death, that he was then seriously mentally ill and that he died of “ arterial sclerotic heart disease due to generalized arterial sclerosis.” Upon cross-examination he stated that there was no history of a mental condition in any of the hospital records prior to decedent’s fall on November 30, 1957. Both doctors minimized the extent of the fall that decedent had sustained. The documentary evidence discloses that at the time decedent made the transfers his signature had become illegible, requiring the use of his fingerprints on the banks’ signature cards and the use of an X for the indorsement of checks.
Four witnesses testified for the respondent to the effect that they saw the decedent on the average of once a week during the year before he died and never noticed anything different, abnormal, or unusual about him. It was indicated that he got about without assistance, that he prepared his own meals, that he went shopping and that the only visible infirmity he manifested was a hand that shook. A fifth witness testified that decedent helped him install a hot-water heater and repair the roof of decedent’s home. On those occasions, decedent showed a familiarity with the proper tools and equipment required and he assisted on the jobs in a competent manner. It was also established that respondent lived with and took care of decedent for approximately 18 years until his death at age 73. Decedent often expressed his gratification that respondent lived with him and disappointment that no one visited him. Under these cir *651 cumstances it would not be unusual to expect that decedent would desire all of his property to go to his closest relative and the one with whom he resided. If he were mentally competent to understand the choice he was making, it would be taken as a matter of course that his decision could be carried out by the creation of a joint account.
The remainder of the evidence adduced of importance was the testimony of the bank representatives, all of whom were petitioner’s witnesses. Mr. Koch, employed by the Williams-burgh Savings Bank as new account teller, testified that the transfer was begun on April 10, 1957 and not completed until April 19, 1957, because the decedent had lost his passbook. He explained from his records that decedent had come to the bank with his niece and that he had been unable to properly sign the signature card for the joint account, so that his fingerprints were substituted. Since the fingerprints were used instead of the signature of the depositor, the latter was then required to identify himself and answer questions so that the interviewer would be satisfied that the depositor was the person in whose name the account originally had been opened. Prior to offering the new account card for signature, the depositors were asked to read the agreement on the back of the card which provides in part: “We hereby declare and agree that this account is a joint account and that all moneys now or hereafter deposited therein, * * * are and shall at all times be subject to withdrawal or other disposal in whole or in part upon the written order of either of us or the survivor ”. Mr. Allison, the assistant manager of the Jamaica Savings Bank, testified that the signature card was lost, hut the ledger card indicated that on April 17, 1957, decedent had transferred his individual account to a joint account, that when such transfers are made the transferor must sign his name and reveal his address, date and place of birth, spouse’s name, number of children, telephone number, father’s name and mother’s name, all of which would he checked against information previously given. In the event that the depositor was unable to sign his name at the time the transfer was made, and having obtained a signature on the original account, the hank would not resort to fingerprints without a certificate from a doctor attesting to the depositor’s mental competency. Since no such certificate was in his files, Mr. Allison testified that the card must have been signed properly. No testimony was elicited from any of the representatives of the banks which indicated that anything unusual occurred with respect to the ability of the depositor to make the transfers in question.
*652 After a most painstaking inquiry into the facts and upon the record as a whole, the court is of the opinion that the creation of the joint accounts in three separate hanks was understood and intended by decedent. Decisions such as Matter of Creek-more (1 N Y 2d 284), originally decided by this court, are not controlling in the instant case. There my factual finding, undisturbed by the Appellate Division (286 App. Div. 857) and accepted by the Court of Appeals, was that the joint accounts were not shown by the surviving claimant to have been ‘1 knowingly and consciously created and sanctioned ” by the depositor. (Matter of Creekmore, supra, p. 289.) Such a finding would not be supported by the evidence herein. Accordingly, the respondent is determined to be the rightful owner of the proceeds of the joint accounts in issue and the petition is dismissed on the merits. Submit decree on notice.